Our next case is 411-0745, Marriage of Schwass. The appellant is Mr. Byers, are you here, sir? The appellee is Mr. Hopp, are you here? I am here. Okay. Mr. Byers, you may proceed, sir. Thank you. May it please the Court? Counsel. The appellant brings this case to this Court with the primary motivating factor of the maintenance award that is the generation of all of the concern that ultimately brought us to file the appeal. The maintenance award is $2,000 a month and is a permanent award and that is the primary motivating factor that caused us to file this appeal. I was not the trial counsel. That was Mr. Geisler on behalf of Mr. Schwass. Mr. Hopp was the trial counsel for Mrs. Schwass and also the appellate counsel. My reading of the transcript since I was not there to actually witness it is probably akin to the reading by you of the transcript since you weren't there to witness it either. Some of the things that pointedly struck out to me from the transcript was first when I read through to try to find what the agreement was that Judge Payne referenced in his order of November 3 and I could not find in the transcript a complete agreement. So I looked at that and I thought and I was actually retained from between the time of the Judge Payne's order and the time that the written judgment was entered. There was a space almost 30 days in there and I was retained in that. So at the time that I had the Judge Payne's order, I did not know and was not aware of the judgment that ultimately was signed because that was done through Mr. Geisler and Mr. Hopp. So it wasn't until later that I saw the written order and it has what purports to be an agreement between the parties as to the House. But when I first looked at it, the order that I was reading from Judge Payne says there's an agreement but the transcript didn't say that there was an agreement. So that made me first… Didn't the parties agree on some aspects? Some aspects they did. They agreed that the House should be appraised. They agreed that my client would have an opportunity to try to buy the House and then they agreed that everything else was in dispute. That what would happen to the House proceeds was yet to be determined. What reimbursements, if any, my client would receive for the mortgage payments that he paid while she was living in the House. But what reimbursements, if any, that my client would receive for the repairs that he was going to make to the House in order to get it into a position to sell. All those things were yet to be decided. But wasn't that the agreement that Judge Payne was referring to? The aspects of the agreement that were an agreement? But it doesn't resolve the issue of the House. Well, no. And therefore, when I looked at that, I thought, well, we don't have a ruling upon the largest asset that the parties own, which was the House. We don't know who gets what out of the House. Because the agreement was incomplete. The agreement was simply that it was going to be sold. There was no disposition of the proceeds that was by agreement. So we have all these proceeds out there. Whether my client bought it or some third party bought it, we still have all these proceeds that have not been allocated by the trial judge to anybody. Or the other issues that go along with that. So that was the first thing that struck me. Was, okay, well, what was supposed to happen with the House? Now, at the time I came to that thought, I had not seen the written judgment, which was later signed, prepared by Mr. Geisler and Mr. Hoffman, later signed by Judge Weber. But just the plain reading of Judge Payne's ruling, plus the transcript, you just don't know where all of those monies went to. Could you summarize the award in this case by saying the court equally divided the property between the two, and then awarded $2,000 a month maintenance? Well, you could know, and not in my view, and let me explain to you why. You think it's off by $18,000? Well, that plus, originally, the House. We didn't know where the House went originally. We just knew it was going to be sold, either to my client or to a third party. And we didn't know where those funds were going to go, originally, under Judge Payne's order. Do you know now? We do now. Yeah, because there's a written judgment that was entered 30 days later. Yeah, I mean, we do know now. But at the time, we didn't know where those funds were going. So, yes, there's an $18,000 difference that we say that, you know, everything else is even. He added $18,000 to it, but where did the House go? Under his original order, no one knows where the House is. So what? You appeal from the final order, right? Well, the final order is based upon the original order that was signed. And the reason that makes it difficult is because, in order to determine the maintenance award, you're supposed to look at the property division first at the trial level. And then you decide maintenance based upon, after you've looked at the property division, and what assets you're going to divide to each of them. If we have the House out here that's yet undivided, how did he come to the maintenance order? Obviously, the House later gets divided in the judgment that's ultimately entered. But the maintenance order isn't changed. It's the original maintenance order that Judge Payne determined when he didn't know where the House assets were going to go. That was the point that I wanted to raise. And that's why it's important to realize the sequence of what happened in this case. Because at the time Judge Payne entered that $2,000 a month maintenance order, there was no allocation of where the House proceeds went. Mr. Hopp had requested 75% of the assets in lieu of maintenance. Mr. Geisler had suggested there should be no maintenance and suggested that the House should be divided equally. There was no division as to the House, either the 75% or the 50%. It was just to be sold. And yet, there was a $2,000 a month maintenance order entered. So that's, at least in my reading of the transcripts, I wasn't there, but in my reading of the transcripts, that's the way I see this scenario set up. So how can you base a maintenance award if you don't know where the property is going? That's one of the real problems. What ultimately happened with regard to the residence? Well, ultimately with regard to the residence, there was a written judgment provided that my client had an opportunity to buy the House and then the House was divided equally, the proceeds from the House were divided equally. If he didn't buy it, it was sold. Well, if it had always been the expectation of the judge that the proceeds of the House were going to be divided equally as they were, then what's the problem? He just didn't explicate it sufficiently? Well, that was after the order entered agreement. That wasn't before the order entered agreement. Unless he had a crystal ball, he wouldn't have known what they were going to agree to later. And they talked about the disposition of the House prior to December 2010? In the transcript, it reads to me that there was agreement that the House was to be sold or my client was to buy it based upon an appraisal amount, but the actual disposition of the monies from that was not agreed upon. There is no agreement as to that. Mr. Hoff was requesting 75%. My client's attorney at the time, Mr. Geisler, was suggesting 50% to each. There was no determination by the trial court as to... And my client also was requesting reimbursement for mortgage payments and reimbursement for repairs that were made. So at the time... Didn't Brenda ask for more than 50% of the House if she were not awarded maintenance? She asked for 75% of all the assets, including the House, if she was not awarded maintenance. Right. And wasn't it suggested that if she were awarded maintenance, it would be a 50-50 split in the House? No, actually, I don't believe that to be the case in my reading of the transcript. But what I believe is that my client was asking for reimbursement for the mortgage payments that he paid,  and then he was asking for 50% of that balance. Not 50% of the gross, but 50% of the balance after he got reimbursed monies. That's what he was asking for. I don't believe Brenda had ever agreed to pay the repairs, had ever agreed to pay reimbursement for the mortgage payments. She was asking for 75% of the gross sales proceeds of the House before those kinds of reimbursements to her husband. So no, I don't believe there was ever a full agreement stated to the court at any time over the House. And so when you read that transcript and you look at his orders, they just don't match. I mean, that's the problem that caused us... And so if that doesn't match, how does he award $2,000 a month in maintenance payments? I want to go on to that now a little bit. She's full-time employed. Since when? 2008. She was part-time employed before 2008. She was full-time employed after 2008. When did her part-time employment begin?  When did her part-time employment begin? 1993 or 4, I think. So for the first 20 years of marriage she was a homemaker? Well, she did other things. The transcript is unclear. I can't answer that. Well, was she out in the workforce for the first 20 years? The transcript is unclear. I wasn't there. I don't know. It just says that my reading of the transcript was simply that she had... My client said that she had always been a contributor to the family income. I don't know in what capacity because it's unclear. Well, one could say that if a homemaker is staying home taking care of kids and doing other stuff that contributes to the family income. Is that what he meant? I don't... My reading of it meant that she had earned some type of money. Now, I can't tell you what because the transcript doesn't say what. I'm amazed that an appellant would tell us the transcript doesn't disclose and argue that we should reverse. Well, the transcript discloses her income from 2008 forward. The transcript discloses that she was some kind of a contributor. It doesn't tell us what kind of contributor before 1994. How can we say the trial court's wrong? Well, the trial... Based upon the earnings that she had in 2008, 2009, and 2010 until the time of the hearing, she will actually earn more money after this award than my client will earn. My client, if you take the $2,000 a month, $24,000 off of his earnings, and you add that $24,000 to her earnings, she earns more on a yearly basis than he does on a yearly basis based upon her 2008, 2009, and 2010 income. And we suggest that whatever contribution she might have originally had in the beginning, she doesn't overweigh the income differentials that there are now. In your judgment, what would have been an appropriate amount of maintenance? Well, Judge, at this point in time, I don't think she actually needed any maintenance. But if she's able to support herself in a good fashion, there is no testimony as to what the lifestyle was other than it was frugal. There is no testimony as to what trips, if any, they took as a family, as to what recreational activities they did as a family. There's no evidence of what her spending pattern was on clothes or amenities. There's no evidence of anything that she did or they did as a family unit outside of the fact that they lived frugally. And I know it's been suggested to the court that she said she was frugal after they separated, but she actually said they were frugal before they separated. This was a frugal family who did nothing, according to the record at least, outside to go to work and come home. And so as far as evidence of lifestyle, she's meeting the lifestyle based on her own income that's in the record. There is no evidence of any lifestyle that she has that she's not able to meet with her own income. So the very basis of the award of maintenance, I think, is subject to question. But it particularly becomes important when you don't know what Judge Payne was thinking when he hadn't divided up the house yet. If he had simply said, okay, the house gets divided 50-50 or whatever, then we wouldn't be standing here with that argument. But at this point in time, we don't know what he was thinking. Can't one infer what he was thinking from the fact of what he did? If you drop the line at the time he signs that order, what did he think was going to happen to the house? There's nothing in his order that tells us what. That doesn't answer my question. I'm sorry. The question was, based upon how the house was ultimately, how proceeds were ultimately divided, can't one infer what he was thinking about how the proceeds would be divided? Well, I don't think you can go backwards in time. So the fact that the house was ultimately divided equally is just happenstance? I believe ultimately that was the agreement that Mr. Geisler and Mr. Hoff entered into, and they made some agreements on reimbursements and things. So the 50-50 split was an agreement between them? After Judge Payne's order was entered, it was an agreement that was entered into between Mr. Hoff and Mr. Geisler, yes. At that point in time, I was unaware of it. I had been talking to Mr. Schwartz, but I was unaware that that had happened. We originally filed our request for rehearing on what I thought might have been the last day because Judge Payne's order didn't say that there was a written order to be filed. In my view, the order that he entered looked as if it was a final order, and it didn't say written order to be filed. Are you correct? Was it the final order then? Well, I was concerned that the 30 days would expire, and I filed it so that my request for reconsideration wouldn't expire. Then I find out that the very same day I filed that, there was the written judgment filed, and then Mr. Geisler filed a request for reconsideration a few days later. He didn't know about me, and I didn't know that he was still involved in the case, but I thought the original order was the final order. So apparently my client didn't keep each of us informed of what the other did, which probably is a fault of his, but that's the way the scenario of things happened. So I was concerned that that original order was the final order. I think this court could have looked at it as the final order, but then on the 30th day or the last day, Judge Weber signs another order, which then ultimately is the final order. So that's the sequence of the timing of things, and it's a little convoluted, but that's in fact what happened. And then we get into the property issues that I've raised, and the property issue basically is with everything being divided equally, why are we paying $18,000 in addition to dividing everything equally, in addition to paying $2,000 a month in maintenance? If you look at the numbers in her brief, it sort of indicates she's short $18,000, don't they? Well, and Mr. Hopp has argued that, that the judge went through and determined the credibility and said, well, her numbers are better than our numbers. I'm not sure what your numbers are. I looked through your brief and couldn't find anything. Well, what we have suggested, if you look at our exhibits, I think I referenced each of the exhibits in my brief, if you look at our exhibits, our exhibits add up that the parties are getting pretty much an equal division of the assets. Now, that's using our numbers as to what the values were. And then Mr. Hopp points out in his brief, that he used different numbers in their exhibits, and he comes up with an $18,000 difference. So obviously, that's an issue that the trial court had to make a decision upon. And then the third issue, and I see my time's getting close, the third issue is the attorney's fees. And there is no showing that Mrs. Schwass would have impacted her ability to meet her needs by paying her own attorney. If you look at the two tests, there's actually no evidence in the record that I could read that said that she was unable to pay her own attorney. And we would ask that those fees also be reviewed by this court and reversed. What we really think is that the case ought to be sent back for either a new trial, and if you don't outright reverse it, I don't have anything else to add. Thank you. Thank you, counsel. Mr. Hopp? Thank you. If it pleases the court, Mr. Byers. Counsel. As you might expect, I have a different point of view, Mr. Byers. I will try to tell you what that is. I was there, I was trial counsel for Mrs. Schwass in this case, and I have a pretty good idea of what I said and what's in the transcript. What I did say in the transcript when we were dealing with a stipulation with respect to the house, we did agree to an appraisal, we did agree to let him have 60 days to try to refinance. Speak up just a little bit. Yes, I'm sorry. My words as well were basically we want a greater share of the proceeds if the court doesn't award maintenance. By making that statement, we were saying, you know, we're going to divide this equally unless we get maintenance. That was what we said. There was no funny agreement between Mr. Geisler or myself. And when we finally got the final argument, my argument was, Judge, if you don't award maintenance, then we'd like 75% of the assets. So your implication, albeit perhaps unsaid, was if you do award maintenance, 50-50 is fine. That is correct. That's exactly what was implied. That was exactly what I understood. What did Mr. Geisler say to you? Well, he approved the judgment as to form with all of that language in there, and I take it from that that he was in total agreement with it. So the two attorneys understood what was involved. So you don't think there's any mystery about what Judge Payne might have been thinking? No. I mean, when I look at Judge Payne's order, what he did, and if you can look at the retirement funds, you can look at the money on deposit, you can look at everything, and he divided it down the middle with the exception of that property issue that we came up with. $18,000? Yes. And by the way, if you look at those numbers, and I would like to just talk about that here very briefly. Number one, Mr. Schwass had a vehicle, and I used his numbers from his affidavit, his testimony, and he, with the amount of money he owed on it, he had about $4,400 in equity. He got that vehicle. We had a vehicle where we owed money on it, and by everybody's agreement, it had an equity of about $900. So we're short about $3,400 to start with. He had a savings account with $5,000 in it. He didn't know where the money came from. It's presumptively under the law, marital property, but he got to keep that by Judge Payne's order. So he's up on us there. He had a Harley-Davidson motorcycle. There were several appraisals. It was free and clear, purchased with marital assets. It was worth over $8,000 minimum to up to right at $12,000. He got that. He had a home in Oakley. Well, he paid $1,000. This was after the separation, which was in September of 2009, and he put $1,000 down. He also paid some people by the name of Parks another about $2,500. He put $3,000 worth of improvements into it. He didn't have an appraisal for it, but we know what he paid for it. We know what he put into it. He's at least, by that, $5,500 up on what he put into that home. He had a life insurance policy. It's non-marital, but it was purchased right before the marriage. This was a 27-year marriage, and the payments on it were made throughout the marriage, and the cash value in it, which was given to him, was about $16,000, and he could not tell us, the transcript says, what the thing was worth when they got married. He was awarded that. Her rings disappeared right after Mr. Schwass was in the house at Thanksgiving time in November 2009. If the judge believed her, he could have awarded her $5,000 for the value of her rings, which were really non-marital property. He took the money, the balance, out of the checking account. He got $1,800 more. Gentlemen, if you add all of that up, we're somewhere between $46,500 and $42,500 more than what Mr. Schwass got. So he gives her $18,000 to even it up. Are we a little shy? Probably so. He did award $5,000 in attorney's fees, which, by the way, can be part of a property settlement agreement. So I don't think there's any mystery. I have a question, just as Cook asked, about her employment and the mystery in the record. There is no mystery in the record. She testified that she was a stay-at-home mom. She got her Bachelor of Science degree. It was either 92 or 93. And she worked part-time at DMH, according to the record, from then until December of 2009 when she became full-time. Did she start part-time? Part-time the entire time. She was part-time from somewhere in 93, I believe, is where she received her degree. Well, my question was before 93. She was going to school, and that's where she earned her Bachelor of Science degree to become a registered nurse. And the reason that she said she stayed home is, A, they had three children, all emancipated by the time we got to the divorce, and a fourth child, which was Mr. Schwass's sister's daughter. They raised that child from age four and a half up to age 18. There's also testimony in the record that she was in the house longer than that. It doesn't say precisely when. And she said, because he had a job where he was on the road a lot, and I had four kids to take care of, I could only work part-time. So I stayed at home while he advanced his career. And, by the way, in the first year that she worked full-time, which we referenced, and if you look at the exhibits, by the way, and I know you asked briefly about what her earnings were, my recollection is you will find the 07, 08, 09, and 10 tax returns. I don't have specifically on my mind what her W-2 form showed for 07, 08, but I know that it will reflect her part-time earnings. Now, if we look at those earnings in the first year she worked full-time, which was 09, she earned about, I believe, $45,000. Mr. Schwass, without the benefits that I referenced in my brief, earned $94,854.69. Now, we've had projections of Mr. Byers as to what Mr. Schwass was going to earn. Gentlemen, that doesn't take into account bonuses that are paid in December and in the first quarter of the year. We don't know what those were or would be. Was the court presented with testimony about what they had been? Yes. I mean, they had, the court had. So there was a practice of these? They had the tax returns. It was brought out in my cross-examination of Mr. Schwass. Yes, they had all of that information. And Mr. Schwass himself testified on the stand in 2010 that he thought his earnings in the year of the divorce would be as good as they were the year before, $94,854.69 or a little bit better. Now, that doesn't include the $560 a month non-taxable that he got for a vehicle expense. It didn't include, in the first seven months of 2010, he had over $7,400 in reimbursable money from his employer. Who was his employer? He worked for Springfield Electric. He was the managing person over in the Decatur office, and that's who he worked for there. So when you look at this case, you really have to look at what, and again, while benefits are not income, by golly, they do defer those expenses on the other side of the ledger. And so when you say that you're getting $560 a month, it pays all for his truck, it pays for his gasoline, it pays for his insurance. He had a credit card bill he said he was running over $1,000 a month. He was about $50 shy of paying all of those types of expenses with just the expense money non-taxable received from his employer. That doesn't include his cell phone that was free, costing him previously $125 a month. So add those together, deduct them from what he has. I think the order was clearly logical. It based upon, I think, frankly, a division of income. A little shy on my side if you figure out what he's actually earning and you add in the benefits, but I think definitely reasonable and definitely based upon a division of assets. When you do that and when you order a property settlement agreement and you order maintenance, the issue doesn't simply come down to can you pay your own attorney's fees. That can be taken into account as part of a maintenance award or a division of property award. I've cited that in my brief. I've spelled it out, I hope, as well as I could. And I understand that perhaps I'm not a perfect writer and I perhaps didn't specify that agreement when we were in the courtroom. That's not the criterion, counsel. I understand that, Your Honor, but I'll confess my limitations after all these years. So if I look at some of other Mr. Byers' points here, there was no order from... If she makes $30,000 a year less than he does, why does she get $24,000 a year in maintenance? Well, number one, that's a projection. The year before it was 50% of what he made. The year before that it was a fraction of it, and in addition doesn't take into account the almost $20,000 in non-taxable benefits he gets from his employer for the vehicle reimbursement, for the cell phone, for the expenses that he gets reimbursed for. Are those matters which you believe the court, to the next size of its discretion, may consider deciding maintenance? I cited some cases in which both of those issues, while not considered per se income, were considered by the court as a benefit because they reduced the expenses. You've got expenses on one side, income on the other. They reduce all those expenses and should be considered in making that award. Well, maybe she didn't have those expenses. The fact that he has them and she doesn't. She had a car payment, Your Honor. He had a truck payment. He had insurance payments on his vehicle, so did she. Apparently he's using the truck in his work, and I don't know that she needs to use the car in her work. But she has to get back and forth to work and has to have a vehicle and did have the vehicle expense just like he did. She has a cell phone expense like everybody else. Is there any reason, she's working at DMH now, isn't she, Your Honor? Yes, she is. As an emergency room nurse? I believe that is correct. Is there any reason to believe that her income is not going to be stable in that role? I wouldn't think that there would be any reason to think that hospitals are going to shut down with what I'm seeing for medical and people like us getting older. Well, I'm wondering with regard to Justice Cook's questions about the percentage of income and all that. I guess her income is likely to be the same or possibly even greater, whereas will his be the same or possibly greater? Well, I think that his could be the same. It could certainly be possibly better. For instance, you mentioned it's about 50% this last year and was 30% the year before. What accounted for that? I think that just that she worked more hours. She worked more hours one year than she did the next. There wasn't any difference in her pay scale. Is there some reflection of a difference in his income? His income is varied somewhat because he does get a draw, but he also gets the bonuses. The record will tell you that the bonuses are based upon business performance, his business location performance. Now, it's probably not a surprise to anybody in this room, but we had a recession in 2008, and when you're in the electric business and supplying contractors and others with electrical parts, your business is down. So if I'm looking at the economy going up and housing going up, can I expect his income with bonuses and the like to go up? Absolutely. Well, I guess the flip side, is there any reason to think that it's as bad as things were this last year, his income won't be any worse? I would think that it would not. He had 07 was $82,278. 08, 97, 454. 09, 94, 854. So you're seeing pretty much of a pattern here, and we're looking at some pretty bad years right there. So I would expect that his income would be going up, yes. Hers, you can only work so much overtime. Well, I guess some of us can work 70 hours a week, but a nurse working 12-hour shifts, it gets a little tough when you get up to 50 years old, which is right about where she was at the time of the divorce. So I don't think her income is going to go very much beyond what it is, if that answers your question. Judge Payne didn't put in his order things for reimbursement for repairs, for money spent, for mortgage payments and things like that. I presume from being in court for about 40 years now, next month it will be 40 years, when a judge doesn't enter those orders, they're just denying them. You don't have to every time somebody makes a little request come in and say, well, I'm going to deny this, this, and this, you just not put it in the order. Is there a question here about Judge Payne's retirement screwing up this whole thing? Instead of having one judge who hears all the evidence and makes a ruling, you have one judge who's gone halfway and then the other judge who's trying to figure out what the first judge did and then finally making a decision? My personal preference is that Judge Payne should have stayed around and not retired until he could finish up this case, but he didn't seem to think that was important enough, I guess, because he left. It would have been better, it would have been seamless if we had done that, but judges retire just like everything else and we have to go with a transcript. Please understand, the judge that made the comments that Frank Byers refers to in his brief also affirmed this decision, saying maybe I wouldn't have made this same decision, but it's within the bounds of the law, and he did that on review. Please understand as well, Mr. Byers did find out about our written order. Do you see any motion to set that aside? Do you see any motion to modify it or change it to say this is not in conformance with Judge Payne's order? No motion was filed. They filed a motion to reconsider, but not to say that the judgment was wrong and I'm representing this guy now and I know it's wrong and we want to set it aside. So I think that gets to be a rather important issue when we deal with it. And by the way, my understanding of the law is when you have a written order and it's maybe a bit different from the docket entry, that the written order controls, the one that's ultimately approved by the parties and signed by the judge. I think the terms in that are the controlling terms. The only question that Frank makes is did Judge Payne know at the time that he divided property, entered the maintenance order, that there was going to be a division of 50-50 with respect to the property? And my answer to that is yes. And again, I know Judge Stagman has said you implied it and if I'd known I was going to be standing here when I made that statement, I would have been a lot clearer on that statement. And I apologize for that, but that's exactly what I intended at the time and I believe that if you read the record, you will believe that to be the case. Other questions, please? Thank you, Counsel. Thank you, gentlemen. Mr. Byers, any rebuttal, sir? Yes. I could be corrected if I'm wrong, but I don't think that I am. I think the testimony was that the first time he had received a bonus for his employment was in 2009 and that he anticipated having the same income in 2010. I don't think there was a historical pattern of him receiving bonuses, at least as put forth in the record. So, and I don't have anything to say because I wasn't there, but that's what I believe the record says is that there was one bonus in 2009 and he expected his income to be comparable to his 2009 income in 2010. I think that addresses a question that you had asked Mr. Hoppe, Justice Cook. The other thing that his employer just doesn't give away money. The reason he gets reimbursed expenses is because he actually expends those expenses. That's in the record. But he doesn't get all of his mileage reimbursed. He gets 75% of his mileage reimbursed. That's in the record. So he has mileage comparable to what she might have as mileage going to and from work. He gets only 75% of his mileage reimbursed. The others, presumably the employer is paying those because he's driving those on behalf of the employer. I don't think his employer simply, with all of its locations around, picks one guy in Decatur and says we're going to give you extra money. I don't think that's realistic or common sense. I think what the employer does is says okay, these are realistic business expenses. We're going to reimburse them. To the extent that he's reimbursed expenses, that cuts down on his expenses. But that doesn't give him additional income and it should not come into play in this setting. The cell phone is something that, of course, is a business cell phone. And so the employer pays the business cell phone. The fact that employees get business cell phones for them to use in their business helps them in the extent that it allows them to do their business. But I don't know that you should attribute that to him outside of his business and say that it helps him outside of his business. I don't know. The record is unclear how many cell phones he might have had. I don't know. All I do know from the record is he had a business cell phone and that got paid by the business. So to the extent he used that cell phone to make a personal call, sure it's a benefit to him. But I don't know that that ought to justify a $2,000 a month maintenance award that's permanent for the rest of his life and her life. And, Your Honor, with regard to the property issues, Mr. Hoff went through everything, but he didn't include all of the personal property at the house. My client left the house and he left with virtually nothing other than his clothes. All of the marital assets were still at the house. She got those. It was in his property list of the marital assets that she got, all of the household furniture, furnishings, goods, and stuff. He got a table and some chairs in the final award, but she got all the other stuff. So it's fun to add up what my client got and just not add in what his client got and say there was a big discrepancy. But if you go back and add both, then you see that the discrepancy is not nearly as set forth by Mr. Hoff in his argument. Now, I don't have much more to add. If there's a question, that's fine. Otherwise, I'm done. Okay. Well, thank you very much. I don't see any. We'll take this matter under advisement. Be in recess.